**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**ATHENA GIANNASCA,**                              :
                                                   :
                          **Plaintiff,**           :
                                                   :
          **-against-**                            :          **REPORT AND**
                                                   :          <u>**RECOMMENDATION**</u>
                                                   :
**MICHAEL J. ASTRUE**[1]                            :          **07 Civ. 341 (VB)(LMS)**
**Commissioner of Social Security,**               :
                                                   :
                          **Defendant.**           :
                                                   :
-------------------------------------------------------------X

**TO:   THE HONORABLE VINCENT BRICCETTI, U.S.D.J.**

        Athena Giannasca brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial

review of the final decision of the Commissioner of Social Security (the "Commissioner"),

which found that she was not entitled to disability insurance benefits under the Social Security

Act (the "Act").  Currently pending before the Court are the Commissioner's motion and the

Plaintiff's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  (Docket #'s 11, 12, 13, 14, 15).  Because I find that the

Commissioner's decision regarding Plaintiff's claims employed the proper legal standards and is

supported by substantial evidence, I conclude, and respectfully recommend that Your Honor

should conclude, that the Commissioner's motion should be granted, Plaintiff's cross-motion

should be denied, and the case should be dismissed.

---

[1] The caption of Plaintiff's Complaint names the "Commissioner of Social Security" as the
defendant in this action.  The current Commissioner of Social Security is Michael J. Astrue, who
was sworn in on February 12, 2007.

I.      **BACKGROUND**

A.      **Procedural History**

On August 23, 2004, Plaintiff applied for a period of disability and disability insurance benefits, alleging August 5, 2003, as the onset date of her disability.  Administrative Record ("AR") 14, 21, 52.  Plaintiff alleged that her rheumatoid arthritis had limited her ability to work. Id. at 51.  Plaintiff's application was denied on February 4, 2005, on the ground that Plaintiff's condition was not severe enough to prevent her from working.  Id. at 22, 25.  On March 9, 2005, Plaintiff retained Lewis B. Insler and Gabriel J. Hermann, of Insler & Hermann, LLP, to represent her in her application for disability benefits.  Id. at 26-28.  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), and she submitted a memorandum setting forth her position with respect to her claim.  Id. at 29, 45.  Plaintiff appeared in person for the April 21, 2006, hearing before ALJ Dennis G. Katz.  Id. at 214.  At the hearing, Plaintiff was represented by Lewis B. Insler, Esq.  Id.

Following the April 21, 2006, hearing, the ALJ issued a decision on June 30, 2006, finding that Plaintiff was not under a disability within the meaning of the Act.  AR 11-20. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  Id. at 7-10. On December 12, 2006, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  Id. at 4.

On January 16, 2007,  Plaintiff, who had appeared *pro se* at the time of her filing, commenced the instant action in this Court (Docket # 1), alleging that the ALJ's decision was erroneous, was not supported by substantial evidence on the record, and/or was contrary to the law.  Docket # 1.  Plaintiff also alleged in her Complaint that the onset date of her disability was June, 2003.  Id.  On May 16, 2007, Herbert S. Forsmith, Esq., filed a Notice of Appearance on

2

Plaintiff's behalf.  Docket # 5.  After filing an Answer (Docket # 7), the Commissioner filed a motion for judgment on the pleadings on the ground that the ALJ's decision was supported by substantial evidence.  Docket #'s 11, 12, 15.  Plaintiff cross-moved for judgment on the pleadings, arguing that the ALJ's decision was not based on a full and fair evaluation of the entire record, was not supported by substantial evidence, and was reached in error.  Docket #'s 13, 14.

>   **B.**   **Medical Evidence**

>   >   **1.**   **Evidence from Plaintiff's Treating and Consultative Physicians**

Plaintiff's medical records begin in 1999 with a visit to Dr. John Schirripa, who appears to have been Plaintiff's primary care physician.  AR 196-97.  On February 6, 2001, Plaintiff received an MRI examination of her brain that revealed no evidence of demyelinating disease or other abnormality.  Id. at 174.  At that time, Plaintiff had complained of numbness of her right forearm and hand, her right knee, and her posterior right calf.  Id. at 170.  She complained that she had had numbness of the arm for two years, and had had numbness of the leg for the past four months.  Id.  On February 8, 2001, Dr. Jerome Gristina reported that Plaintiff's numbness in her arm and hand was intermittent, and that it had occurred without any particular pattern.  Id.  Plaintiff reported that at times the numbness had lasted for days.  Id.  Plaintiff also reported that she had recently given birth, and that her symptoms were neither worse nor better during her pregnancy.  Id.  Upon examination, Dr. Gristina observed that Plaintiff ambulated without difficulty, and he reported that there was no evidence of scoliosis.  Id.  He also observed that Plaintiff was pain free in her cervical and lumbosacral range of motion, and he reported Plaintiff's reflexes as equal and active in the uppers and lowers.  Id.  Plaintiff's sensation was reported as intact, and it was also reported that there was no evidence of motor weakness.  Id.

3

Dr. Gristina reported that all of his findings were within normal limits in both the upper and lower extremities. Id.

On March 28, 2001, Plaintiff reported continued numbness in her right arm, right leg, and knee to Dr. Schirripa. AR 204. On April 12, 2001, Plaintiff was examined by Dr. Alan Brown. Id. at 178. Dr. Brown reported that Plaintiff had complained of numbness in her right arm of "somewhat greater than one year." Id. He also reported that Plaintiff had complained of some numbness in her knees and ankles, primarily on her right side. Id. Dr. Brown reported that his neurological examination of Plaintiff was "entirely normal." Id. Plaintiff was reported as alert and oriented. Id. No ataxia was reported. Id. Plaintiff's cranial nerves were reported as intact. Id. Plaintiff's ocular movements were reported as full, and it was reported that she had no focal limb weakness. Id. The motor examination was reported as normal and there was no atrophy, weakness or fasciculation. Id. Plaintiff's "DTR's were intact and symmetrical" in the biceps, triceps, brachio-radialis as well as the knee and ankle reflexes. Id. Dr. Brown reported that the explanation for Plaintiff's symptoms was unclear. Id. at 179. He reported that the negative MRI and the negative clinical neurological examination were strong evidence against demyelinating disease. Id. Dr. Brown reported that he anticipated that remaining tests on Plaintiff would have proved negative, but that he planned on speaking with Plaintiff about scheduling a carotid duplex examination. Id. On May 3, 2001, a real time and doppler evaluation of Plaintiff's carotid arteries was performed. Id. at 175. No significant atherosclerotic plaque formation was identified, and it was reported that there was no evidence of hemodynamic significant stenoses. Id.

On June 19, 2002, Plaintiff visited Dr. Schirripa complaining of morning swelling to her neck. AR 203. On February 24, 2003, Plaintiff visited Dr. Schirripa complaining of a head cold,

sinus pain, and ear pain.  Id. at 202.  Almost two months later, she complained of lingering ear

pain.  Id. at 201.  On May 7, 2003, Plaintiff visited an ear, nose and throat specialist complaining

of recurrent ear pain and infection since January, 2003.  Id. at 180.  Dr. Jeffrey Cousin reported

that Plaintiff was suffering from recurrent ear pain, but that her recent bout of otitis had resolved.

Id.  He also reported that there was some evidence of TMJ dysfunction which could have been

causing the recurring pain, and he recommended that Plaintiff take Motrin as necessary.  Id.

On June 5, 2003, Plaintiff visited Dr. Jacobo Futran.  AR 92.  Dr. Futran reported that

Plaintiff had complained of decreased range of movement of her hands and wrists, decreased

grip strength, and arthralgia that was worse in the mornings.  Id. at 181.  Plaintiff stated that she

had had good days and bad days, and that on the bad days, she had had stiffness lasting most of

the day.  Id.  Plaintiff reported that she had had a "long-term history of acrocyanosis and

probably no triphasic Raynaud's."  Id.  Plaintiff also reported mild arthralgia in both knees since

her late 20's.  Id.  On examination, Dr. Futran reported 14 active joints including 4 effusions.  Id.

He reported that the joints involved were both shoulders and both wrists, metacarpophalangeal

joints in both hands, and proximal interphalangeal joints in the right hand.  Id.  Dr. Futran's

impression was that Plaintiff probably had early stages of rheumatoid arthritis.  Id.  He

prescribed Celebrex 200 mg to Plaintiff, and he requested a laboratory workup.  Id.

On September 11, 2003, Plaintiff returned to Dr. Futran complaining of an episode of

swelling to her face and neck that had required her to seek emergency room attention.  AR 182.

Dr. Futran reported that "[a]pparently [Plaintiff] improved spontaneously after two weeks."  Id.

Dr. Futran also reported that laboratory work that was completed on Plaintiff in June, 2003, had

been normal.  Id.  He reported that Plaintiff had a progression of arthritis, and he prescribed

Naprosyn 500 mg, Methotrexate 10 mg once per week, and Folic acid 1 mg.  Id.

On October 15, 2003, Dr. Eugene Ferraro, a radiologist with St. John's Radiological Associates, reported that on examination, Plaintiff's hands and feet were normal with no significant arthritis present.  AR 175.  Five days later, Plaintiff visited Dr. Futran and told him that she had had significant improvement in the arthralgia in her hands and in her morning stiffness.  Id. at 182.  Dr. Futran reported that Plaintiff had stated that she improved "very fast" with Methotrexate.  Id.  He noted that Plaintiff may have had a viral induced arthritis that was improving significantly.  Id.  Plaintiff's knee pain was reported as probably related to chondromalacia of the patella.  Id.  Dr. Futran recommended to Plaintiff that she continue her medications and that she also do quadriceps strengthening exercises.  Id.  On February 4, 2004, Plaintiff's examination by Dr. Futran revealed no active joints and a positive reaction to the combination of medications.  Id. at 95.

On August 9, 2004, Plaintiff visited Dr. Futran where she reported that she had had a flare-up of her arthritis that may have been the result of her discontinuing her medications roughly five months earlier.  AR 100, 115.  About a month after Plaintiff's visit to Dr. Futran, Dr. Ferraro examined Plaintiff's thoracic and cervical spine.  Id. at 177.  He observed that there was no evidence of fracture, subluxation or disc space narrowing.  Id.  On September 14, 2004, Dr. Gary Tannenbaum examined Plaintiff for a diffuse mass at the base of her neck, and he recommended a CT scan.  Id. at 183.  Six days later, Plaintiff returned to Dr. Futran, and Dr. Futran reported that Plaintiff's condition had improved from the prior month, with her having only eight active and effusion joints.  Id. at 115.  On November 22, 2004, Dr. Tannenbaum reported that a CT scan had been obtained, and that it revealed evidence of prominent fatty tissue in her neck without evidence of tumor formation.  Id.  He reported that Plaintiff underwent excision of the fatty tissue which revealed adipose tissue without evidence of lipoma.  Id. at 184.

Dr. Tannenbaum reported that Plaintiff had been healing well.  Id.

At some point after Plaintiff's September 20, 2004, visit with Dr. Futran, Dr. Futran

completed a disability evaluation of Plaintiff.  AR 83-89.  He noted that he last saw Plaintiff on

September 20, 2004, and that he first saw Plaintiff on June 5, 2003.  Id. at 83.  Dr. Futran

reported that Plaintiff's treating diagnosis was rheumatoid arthritis, and that she had had pain in

most peripheral joints and stiffness that lasted all day.  Id.  He noted that he treated Plaintiff

every six to eight weeks.  Id.  Dr. Futran reported that he had initially started Plaintiff on

Methotrexate on September 11, 2003, and that Plaintiff had improved.  Id. at 84.  He reported

that Plaintiff discontinued her medications in March, 2004, and that when she visited his office

on August 9, 2004, she had had a severe flare-up when, on examination, she had 36 active joints

including 18 effusions.  Id.  Dr. Futran noted that he restarted Plaintiff on her medications at that

visit and that three weeks later, at Plaintiff's next visit, she had 8 active joints and no effusions.

Id.  Dr. Futran reported that "[e]ven though [Plaintiff] ha[d] severe pain, the disease [was]

improving."  Id.  He noted that Plaintiff's range of motion in her shoulders, elbows, wrists, knees,

hips, spine, and ankles were normal, and that there was no significant abnormality in her gait.

Id. at 85.  Dr. Futran opined that Plaintiff could occasionally lift 5 pounds, stand and/or walk less

than 2 hours per day, sit less than 6 hours per day, and push and/or pull a limited amount in her

upper extremities.  Id. at 86.  He noted no other limitations nor any conditions significant to

Plaintiff's recovery.  Id. at 86-87.

On November 23, 2004, Plaintiff visited Dr. Futran, where she reported that she had had

weakness and morning stiffness.  AR 128.  In March, 2005, Dr. Futran observed that Plaintiff's

rheumatoid arthritis was "very active."  Id.  A few weeks later, Plaintiff reported to Dr. Futran

that there had been some improvement, but that she continued to have good days and bad days.

7

AR 129.  In an April 19, 2005, letter to Dr. Schirripa, Dr. Futran wrote that since August 9,

2004, Plaintiff's rheumatoid arthritis had been only partially controlled even though Dr. Futran

had increased Plaintiff's dose of Methotrexate.  Id. at 188.  Dr. Futran reported that Plaintiff had

seronegative rheumatoid arthritis that was very active and resistant to treatment with

Methotrexate, but that Plaintiff tolerated her medications well.  Id.  He prescribed Humira 40 mg

every other week and recommended that Plaintiff continue taking her other medications.  Id.

Plaintiff visited Dr. Futran on July 2, 2005, complaining of active rheumatoid arthritis,

and in November, 2005, she visited Dr. David Engelbrecht.  AR 151, 186.  Dr. Engelbrecht

reported that Plaintiff had stated that she had stopped taking Humira and Methotrexate about a

year and a half prior to the November, 2005, visit with him because the medications had turned

her gums black.  Id. at 186.  Dr. Engelbrecht also reported that Plaintiff's joint pains were often

very bothersome because she had not been taking her medications.  Id.  On examination,

Plaintiff's wrists, hands, hips, and ankles were reported as not tender.  Id.  It was reported that

Plaintiff had limited range of motion in her shoulders, had slight tenderness on her left elbow,

had slight tenderness on her right knee, and had minimal tenderness on her right foot.  Id.  Dr.

Engelbrecht opined that Plaintiff had rheumatoid arthritis with her flare-up occurring consequent

to her discontinuation of medications.  Id.  He reported that he restarted Plaintiff on her

medications, and he recommended to Plaintiff that she take a supplement known as joint fuel.

Id.

On March 21, 2006, Dr. Futran completed a functional capacity assessment of Plaintiff.

AR 142-48.  He noted that his most recent treatment of Plaintiff to date had been seven days

prior to the completion of the assessment, and that he had been treating Plaintiff every two

months.  Id. at 142.  He reported that he had diagnosed Plaintiff with rheumatoid arthritis, and on

8

physical examination, Plaintiff had 38 active joints including 16 effusions.  Id.  He reported

Plaintiff's pain as severe in most peripheral joints that had been worse in the mornings.  Id.  Dr.

Futran noted that the diagnostic tests, including blood work that had been completed of Plaintiff,

had been reported as negative.  Id. at 143.  He left blank the section identifying any devices that

Plaintiff used to help alleviate her symptoms, and left blank the section identifying any

psychological conditions that affected Plaintiff's physical condition.  Id. at 143-44.  He reported

that Plaintiff's impairments had not lasted nor were expected to last at least 12 months, and he

opined that January, 2006, was the earliest date that his current evaluation of Plaintiff's

symptoms and limitations applied.  Id. at 144.  He opined that Plaintiff's symptoms were severe

enough to interfere with her attention and concentration.  Id.  He also offered the somewhat

contradictory opinion that Plaintiff was capable of tolerating "high stress work," but he then

opined that she could not work.  Id.  With the exception of noting that Plaintiff could not walk a

city block without resting, Dr. Futran left blank the remaining four pages of the evaluation,

which requested the length of time Plaintiff could sit and stand, the amount of weight Plaintiff

could lift, carry, push and pull, and whether Plaintiff had any limitations in terms of reaching,

grasping, fingering, manipulating, and rotating.  Id. at 145-48.

        In a May 7, 2006, note written on a prescription notepad, Dr. Futran wrote that he had

been following Plaintiff since June 5, 2003, and that her rheumatoid arthritis had affected her

working capability.  AR 210.

## 2.   <u>Evidence from the State Agency Medical Consultant</u>

        On December 14, 2004, Plaintiff received a disability evaluation by Dr. Thomas Li on

referral from the Division of Disability Determinations.  AR 101-05.  Dr. Li noted in his report

that he had had no prior doctor-patient relationship with Plaintiff.  Id. at 104.  On examination,

Plaintiff had stated to Dr. Li that she had had pain and tightness in most of her body joints, hands, arms, feet, and knees.  Id. at 101.  She had stated that in June, 2003, she had visited a doctor who had then referred her to a rheumatologist and other specialists.  Id.  Plaintiff had further stated that she was seeing a doctor every six weeks.  Id.  She had stated that on good days, she had been able to do some chores at home, but that on bad days, she had been "practically closed in her own apartment, unable to do anything else."  Id.

Plaintiff had stated that she had been hospitalized in 1992 for removal of her gall bladder and in 2004 for removal of a skin tumor on her lower neck.  AR 101.  She had reported that her current medications were Methotrexate, Nortriptyline, Naprosyn, Ultracet, and Folic acid.  Id.  Dr. Li reported that Plaintiff had stated that cooking, cleaning, and laundry were not possible because the day following her doing those chores she had been in severe pain.  Id. at 102.  She had stated that prolonged standing, walking, or bending had been aggravating.  Id.  She had also stated that she showered, but that she had needed help getting in and out of the tub.  Id.  Plaintiff had told Dr. Li that she had some difficulty dressing and undressing herself.  Id.  She had also reported to Dr. Li that she had last worked in 2001 as a teller's manager at a bank.  Id.

On examination, Dr. Li reported that Plaintiff appeared to be in no acute distress.  AR 102.  He reported that Plaintiff's gait was normal, that she could walk on her heels and toes without difficulty, that she could squat in full, that her station was normal, that she needed no assistance in dressing for the exam, that she needed no assistance getting on and off the examining table, and that Plaintiff was able to rise from the chair without difficulty.  Id.  Dr. Li reported that Plaintiff's hand and finger dexterity were intact, and that her grip strength was 5/5 bilaterally.  Id.  Full flexion and full extension were reported in Plaintiff's cervical spine, with no cervical or paracervical pain or spasms reported.  Id.  Plaintiff complained of discomfort in her

cervicothoracic junction, which Dr. Li noted had appeared to be where the removal of her skin

tumor took place.  Id. at 103.  Dr. Li reported that Plaintiff was right handed, that there was full

range of motion in Plaintiff's shoulders, elbows, forearms, and wrists, that she had no

inflammation, effusion, or instability, that Plaintiff's strength was 5/5 in the proximal and distal

muscles, and that there was no muscle atrophy or sensory abnormality.  Id.  Dr. Li also reported

that there was slight weakness in Plaintiff's right upper extremity when compared to the left

resulting in just less than 5/5 strength compared to 5/5 strength on the left.  Id.  He noted that

Plaintiff had full range of motion in her hips, knees, and ankles, that her strength was 5/5 in her

proximal and distal muscles in her lower extremities, that there was no muscle atrophy or

sensory abnormality in her lower extremities, and that she had no joint effusion, inflammation or

instability in her lower extremities.  Id.

Dr. Li diagnosed Plaintiff with a history of rheumatoid arthritis with on and off

exacerbation and good days and bad days.  AR 103.  An x-ray taken of Plaintiff's right hand on

the date of Dr. Li's examination was unremarkable, revealing no significant pathology, no loose

body or dystrophic calcification, no bony overgrowth, and no soft tissue swelling.  Id. at 105.

Dr. Li reported Plaintiff's prognosis as "stable."  Id. at 103.  In his medical source statement, Dr.

Li noted that there was a marked limitation on bad days and mild limitations on good days in

daily activities such as house chores.  Id.

Following Dr. Li's examination of Plaintiff, on February 2, 2005, an assessment of

Plaintiff's physical residual functional capacity was performed by a state agency medical

consultant.  AR 106-11.  The assessment provided that based on the medical evidence up to that

date, Plaintiff could occasionally lift and/or carry 10 pounds, could frequently lift and/or carry

less than 10 pounds, could stand and/or walk for a total of at least 2 hours in an 8 hour workday,

could sit for a total of about 6 hours in an 8 hour workday, and could push and/or pull an unlimited amount, other than as shown for lift and/or carry. Id. at 107. In support of those conclusions, the assessment highlighted that Dr. Futran's examination on September 20, 2004, revealed that Plaintiff had had pain in most peripheral joints and had had stiffness lasting all day, but that Plaintiff's shoulders, elbows, wrists, knees, hips, ankles, and cervical and lumbar spine had been all normal in terms of range of motion. Id. The assessment provided that Dr. Futran had reported that Plaintiff's condition had improved from the time treatment first began in 2003, despite Plaintiff still having had significant arthralgia in multiple joints. Id. The consultant also noted that Dr. Li's December 14, 2004, consultative examination revealed that Plaintiff had been normal except for slight weakness in Plaintiff's right upper extremity when compared to the left, and that Plaintiff had had good days and bad days. Id.

The assessment also provided that Plaintiff had had several postural limitations, including occasional ability to climb, balance, stoop, kneel, crouch, and crawl. AR 108. There were no limitations reported in terms of Plaintiff's manipulative, visual, or communicative abilities. Id. at 108-09. The assessment also provided that Plaintiff had no environmental limitations. Id. at 109. With regard to Plaintiff's symptoms, the assessment provided that Plaintiff had written that she used to be very active but that she had been limited in all activities due to her pain. Id. The consultant reported that Plaintiff's statements were not consistent with the propensity of the physical findings which were minimal. Id. The consultant also reported that Dr. Li's opinion was given "the proper consideration," and that Dr. Futran's opinion was "considered and found to be inconsistent with physical findings." Id. at 110. The consultant noted that clarification of Dr. Futran's opinion had been sought, but that "he never responded." Id.

12

C.      **Other Evidence**

1.      **Evidence from Disability Records**

On August 23, 2004, T. Lawrence completed a disability report after interviewing Plaintiff.  AR 58-60.  Plaintiff's interview was conducted in person.  Id. at 59.  Lawrence reported that Plaintiff's alleged onset date was August 5, 2003, and that Plaintiff's date last insured was December 31, 2006.  Id. at 49, 58.  Lawrence also reported that Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, and/or writing.  Id. at 59.  Lawrence noted that Plaintiff was cooperative during the interview.  Id.

In that interview, Plaintiff stated that her rheumatoid arthritis limited her ability to work.  AR 51.  She stated that on some days, she could not squeeze her hands shut or lift her arm up.  Id. at 52.  Plaintiff stated that she had had stiffness, and that there were days when she had been "crippled."  Id.  She stated that her condition first bothered her in 1990, but that she became unable to work due to her condition on August 5, 2003.  Id.  She also stated that she had worked after the date that her condition had first bothered her, but that her condition became progressively worse.  Id.  Plaintiff reported that she had stopped working on February 1, 2001, because she had wanted to seek new employment.  Id.  She stated that she had a two-year college education, that she had worked as a bank teller manager, and that she frequently had to lift and carry 10-20 pounds at her job with the bank.  Id. at 53, 56.

On September 21, 2004, Plaintiff completed a disability report regarding her condition.  AR 62-72.  She provided that she lived with her family, and that when she was capable, she was a full time mother.  Id. at 62-63.  Plaintiff wrote that because of her extreme pain, she had a housekeeper and a "mothers helper" to help take care of her children.  Id. at 63.  She also

reported that her husband took care of their dog.  Id.  She wrote that she had had the pain for the

past 10 years, but that it had only recently started affecting her activities.  Id. at 70.  She noted

that the pain was constant, and that she felt the pain in her knees, elbows, wrists, shoulders, hips,

ankles, neck, fingers, hands, and all of her joints.  Id.  Plaintiff reported that her condition caused

her an uncomfortable sleep as she would wake up with pain in her knees, wrists, neck, back and

ankles.  Id. at 63.  Plaintiff reported that she always felt the pain, that the pain never went away,

and that her medication did not relieve the pain.  Id. at 70.  She wrote that she used to be very

active and that she had participated in softball and bowling.  Id. at 66.  Plaintiff reported that due

to the pain, she was limited to watching television.  Id.

She specifically wrote that due to her condition she was no longer able to lift, bend, sit

for any length of time, lay in bed, carry anything heavy, place her children into their car seats, or

write without extreme pain.  AR 63.  A few pages later, she wrote that she found it difficult to

lift, stand, walk, sit, climb stairs, kneel, squat, reach, and use her hands.  Id. at 67.  She noted that

it was very difficult for her to dress herself and to care for her hair, but that bathing and feeding

herself were manageable.  Id. at 63, 64.  She reported that she prepared her meals on a daily

basis, but when she did not prepare her meals, her housekeeper, family or friends did it for her.

Id. at 64.  She wrote that she was unable to do any house or yard work because her pain was

excruciating.  Id. at 65.  Plaintiff reported that she seldom shopped in stores because of her pain,

and that most of her shopping was done online with the help of someone typing.  Id. at 66.  She

reported that when her pain was severe, she did not socialize because she was uncomfortable and

embarrassed.  Id. at 67.  However, she reported that on good days, she went outside daily, and

that when she went out, she either drove a car or rode in a car.  Id. at 65.  She reported as "not

applicable" a question that asked how far she was able to walk before she had to stop and rest.

Id. at 68.  She also reported that she had no problem paying attention.  Id.

In an unsigned report dated March 11, 2005, and entitled "Disability Report - Appeal,"
Plaintiff wrote that there had been no change in her condition since she last completed a
disability report.  AR 75, 79.  She reported that she was in constant pain, but that on some days
she was able to get out of bed and manage somewhat normally.  Id. at 79.  She reported that
there were other days when "if [she] got out of bed, it t[ook] everything [she had]."  Id.

### 2.   Evidence from the April 21, 2006, Hearing

At the time of Plaintiff's hearing before ALJ Katz on April 21, 2006, Plaintiff testified
that she had stopped working in 2001 after the birth of her first child because her body "just
couldn't handle it."  AR 217.  She testified that she had a second baby in February, 2002.  Id.

Plaintiff testified that she had days that were better and days that were worse, and she
stated that half of the month would be good days and half of the month would be bad days.  AR
226.  On a worse day, she testified that her pain was very intense to the point where she could
not function.  Id.  Plaintiff testified that there had been days when she did not get out of bed, and
that there had been days when walking to the bathroom had taken effort.  Id. at 219.  She also
testified that she never got a full night's sleep because of the pain.  Id. at 229.  She testified that
there had been days when she had walked for 15 or 20 minutes and sat for 20 minutes at a time.
Id. at 219.

Plaintiff testified that she did not do household chores on a regular basis.  AR 226.   She
testified that she had difficulty using her hands because they would swell or become stiff and she
would drop things, but she also testified that she had changed her children's diapers and that she
drove most of the time.  Id. at 220.  She testified that on days when her neck was tight, she did
not attempt to drive.  Id.  She also testified that she had not attempted to look for another job,

even a part-time job that would have been less demanding on her.  Id. at 222.

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider [] the whole record, examining evidence from both sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  Moreover, the ALJ "has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."  Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).

B.    **Determining Disability**

In the context of either disability benefits or SSI, the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  In evaluating a disability claim, regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow.  See 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial gainful activity."  Id. at §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b).  If the claimant is engaged in "substantial gainful activity," then the Commissioner will find that the claimant is not disabled.  Id.  Second, the Commissioner considers the medical severity of the claimant's impairments.  Id. at §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii).  The claimant's impairment will not be deemed severe "[i]f [he or she] do[es] not have any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities."  Id. at §§ 404.1520(c); 416.920(c).  Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations.  See id. at §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d).  If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity.  See id. at §§ 404.1520(e); 416.920(e).  Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do his or her

17

past relevant work.  See id. at §§ 404.1520(a)(4)(iv),(e)-(f); 416.920(a)(4)(iv),(e)-(f).  Finally, if

it is found that the claimant cannot do his or her past relevant work, the Commissioner will

consider the claimant's residual functional capacity, age, education, and work experience to see

if he or she can make an adjustment to other work.  See id. at §§ 404.1520(a)(4)(v),(g);

416.920(a)(4)(v),(g).

    The claimant bears the burden of proof on the first four steps of this analysis.  DeChirico

v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted).  If the ALJ concludes at an

early step of the analysis that the claimant is not disabled, he or she need not proceed with the

remaining steps.  Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is

necessary, the burden shifts to the Commissioner to show that the claimant is capable of other

work.  DeChirico, 134 F.3d at 1180 (citation omitted).

## III.   **DISCUSSION**

    In deciding Plaintiff's case, the ALJ applied the required five-step sequential analysis set

forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in "substantial

gainful activity" from her alleged onset date through the date of the ALJ's decision.  AR 16.[2]

Second, he found that the medical evidence established that Plaintiff had been diagnosed with

---

[2] As an initial matter, as noted in Section II (B), the Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last *for a continuous period of not less than twelve months*."  42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  Alarmingly, according to a notation by Plaintiff's own treating physician, Plaintiff may have failed to establish that she suffered from a "disability."  As Dr. Futran opined in his March 21, 2006, functional capacity assessment of Plaintiff, Plaintiff's impairments had not lasted nor were expected to last at least 12 months.  AR 144.  However, Dr. Futran also noted that the earliest date to which his opinion applied was January, 2006.  Id.  No matter Dr. Futran's opinion, it remains possible for Plaintiff to establish that she did indeed meet the definition of "disability" from her alleged onset date through the date of the ALJ's decision.

rheumatoid arthritis.  Id.   The ALJ found that this impairment was "severe" within the meaning

of the Social Security Regulations.  Id.  Third, the ALJ found that while Plaintiff's impairment

was "severe" within the meaning of the regulations, it did not "'meet any impairment in the

Listings.'"  Id.  Therefore, the ALJ went on to determine Plaintiff's residual functional capacity,

and he concluded that Plaintiff retained the residual functional capacity to perform the "full

range of sedentary exertion level work."  Id. at 16, 19.  He found that on a sustained basis in a

work environment, Plaintiff "c[ould] sit for a total of 7 hours in an 8-hour workday, stand/walk

for a total of 2 hours in an 8-hour workday and lift/carry objects weighing a total of 10 pounds."

Id. at 19.

        At the fourth step in the analysis, the ALJ found that Plaintiff was unable to perform her

past relevant work as that work required a light level of exertion.  AR 19.  At the fifth step, the

ALJ consulted the medical vocational guidelines (the "grids") contained in 20 C.F.R. Part 404,

Subpart P, Appendix 2, taking into account Plaintiff's residual functional capacity, age,

education, and work experience.  Id.  The ALJ found that Plaintiff was "31-years-old on her

alleged onset date" placing her in the category of "younger individual."  Id.  He also found that

Plaintiff had a "high school education," and that she was "sufficiently literate and able to

communicate in the English language."  Id.  The ALJ also found that in view of Plaintiff's age,

education and residual functional capacity, the "issue of transferability of skills [was] not

material."  Id.  As a result of these findings, he found that there were jobs that existed in

significant numbers in the national economy that Plaintiff could have performed.  Id.

Consequently, the ALJ determined that Plaintiff was not under a disability within the meaning of

the Act at any time through the date of his decision.  Id.  He concluded that Plaintiff was not

entitled to a period of disability or disability insurance benefits under the Act.  Id. at 20.

19

The Commissioner moves for judgment on the pleadings, contending that the ALJ's decision was supported by substantial evidence.  Docket #'s 11, 12, 15.  In her motion papers, Plaintiff contends that the Commissioner's decision was not based on a full and fair evaluation of the entire record, was not supported by substantial evidence, and was reached through error.  Docket #'s 13, 14.  Specifically, Plaintiff contends that the Commissioner failed to properly determine Plaintiff's residual functional capacity; failed to properly consider Plaintiff's treating source opinion; and failed to properly consider Plaintiff's credibility and her alleged symptoms.  Docket #'s 13, 14.  Thus, Plaintiff asks this Court to reverse the Commissioner's decision and award Plaintiff a period of disability and disability insurance benefits.  Id.

**A.**     **The Assessment of Plaintiff's Residual Functional Capacity**

Plaintiff argues that the ALJ's determination that she could perform the "broad range of sedentary work" was "analytically inadequate" and "unlawful" because the evidence in the record does not support that finding of capacity.  In support of her conclusions, Plaintiff argues that because she had "been found to have significant pain" and had often been found to have "multiple 'active' joints" as a result of her arthritis, the ALJ should have further inquired about Plaintiff's limitations before concluding that she could perform "competitive, full-time work for sustained periods."  However, further inquiry into those areas was unnecessary as the ALJ's determination as to Plaintiff's residual functional capacity was supported by substantial evidence in the already existing record.

The ALJ determined that Plaintiff retained the residual functional capacity to perform the full range of sedentary work.  AR 16.  Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."

20

20 C.F.R. § 404.1567(a).[3]  Further, "[a]lthough a sedentary job is defined as one which involves

sitting, a certain amount of walking and standing is often necessary in carrying out job duties."

20 C.F.R. § 404.1567(a).  The regulations provide that, "[j]obs are sedentary if walking and

standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §

404.1567(a).

The ALJ found that Plaintiff had the residual functional capacity to "sit for a total of 7

hours in an 8-hour workday, stand/walk for a total of 2 hours in an 8-hour workday and lift/carry

objects weighing a total of 10 pounds."  The ALJ stated that he had reached this finding based on

the "entire record," including the assessments by the state agency reviewer and by Dr. Futran, as

well as from "[Plaintiff's] testimony."  AR 19.

The assessment issued by the state agency reviewer on February 2, 2005, reported that

Plaintiff could occasionally lift and/or carry 10 pounds, that she could frequently lift and/or carry

less than 10 pounds, that she could sit for about 6 hours, that she could stand and/or walk for at

least 2 hours in an 8-hour workday, and that she exhibited no manipulative limitations.  The ALJ

found that the agency assessment was consistent with Dr. Li's report.

Dr. Futran's assessment that followed the September 20, 2004, visit with Plaintiff differed

in that he reported that Plaintiff could lift and/or carry up to 5 pounds, that she could sit for less

than 6 hours per day, and that she could stand and/or walk for less than 2 hours a day.  His

assessment was consistent with the state agency reviewer's assessment in that he reported that

---

[3] The Social Security Administration has further explained that " '[o]ccasionally' means
occurring from very little up to one-third of the time.  Since being on one's feet is required
'occasionally' at the sedentary level of exertion, periods of standing or walking should generally
total no more than about 2 hours of an 8-hour workday, and sitting should generally total
approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6 (S.S.A.
1983).

Plaintiff exhibited no manipulative limitations.  Dr. Futran completed another assessment of Plaintiff on March 21, 2006, but with the exception of noting that Plaintiff could not walk a city block without resting, he left blank the pages of the assessment requiring definitions of the length of time Plaintiff could sit and stand, the amount of weight Plaintiff could lift and carry, and whether Plaintiff had any manipulative limitations.

The ALJ found that while the agency's assessment differed from Dr. Futran's September, 2004, assessment, Dr. Futran's evaluation was provided at a time "during which [Plaintiff] was having an arthritic exacerbation (which began in August 2004) and was not typical" of either the overall treating record or Dr. Futran's later assessment in March, 2006.  AR 17.  The ALJ also found as "highly conclusory" Dr. Futran's March, 2006, finding that Plaintiff "[could not] work at the present time."  Id.

Under the Social Security regulations, a treating physician's opinion regarding the nature and severity of a claimant's impairments will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(d)(2); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  "A record that does not support a treating physician's opinion does not necessarily contain deficiencies or gaps."  Rebull v. Massanari, 240 F. Supp. 2d 265, 272 (S.D.N.Y. 2002).  " 'As the Second Circuit has explained, while the opinions of a treating physician deserve special respect, ... they need not be given controlling weight where they are contradicted by other substantial evidence in the record ....' " Id. at 273 (citations omitted).  Here, the ALJ explicitly considered Dr. Futran's September, 2004, functional capacity assessment but concluded that it was inconsistent with the evidence in the administrative record, including the opinions of Dr. Li and Dr. Engelbrecht, Dr. Futran's own

treatment notes, and the assessments by the state agency reviewer in February, 2005, and Dr. Futran in March, 2006.

Dr. Futran reported in his September, 2004, assessment that based on the medical findings provided in his report, his opinion was that Plaintiff was limited to occasionally lifting 5 pounds, standing and/or walking for less than 2 hours, and sitting for less than 6 hours per day. However, Dr. Futran failed to set forth what those medical findings were in support of his conclusions as to Plaintiff's limitations.  In fact, in his assessment, there does not appear to be any support for his conclusions other than Plaintiff's own allegations of severe pain.  Rather, his report revealed that Plaintiff's range of motion in her shoulders, elbows, wrists, knees, hips, spine, and ankles were normal, that there was no significant abnormality in her gait, that her test results were negative, and that Plaintiff continued to improve while she was taking her medications.  Those positive findings failed to provide a basis for Dr. Futran's conclusions as to Plaintiff's limitations.

The ALJ also found that Dr. Futran's findings as to Plaintiff's limitations were inconsistent with Dr. Li's and Dr. Engelbrecht's evaluations, noting that Plaintiff's condition improved following Dr. Futran's September, 2004, evaluation.  The ALJ noted Dr. Li's December, 2004, examination of Plaintiff, in which Dr. Li reported that Plaintiff had stated that she had a "waxing" and "waning" of her symptoms, as opposed to Dr. Futran's notation that Plaintiff suffered from pain all day.  He also noted that Dr. Li opined that Plaintiff had a "marked limitation" on bad days and "mild limitations" on good days in daily activities such as house chores, but that Dr. Li's physical examination of Plaintiff was reported as normal with no signs of joint effusion, inflammation, or instability.  The ALJ also noted Dr. Engelbrecht's evaluation of Plaintiff from November, 2005, in which Dr. Engelbrecht reported that his impression was

that Plaintiff had rheumatoid arthritis "with flare-up occurring consequent to discontinuation of medications." Dr. Engelbrecht also reported that "[Plaintiff's] joint pains [were] often very bothersome since she [was not] currently on any analgesic." Even Plaintiff's treatment history obtained from Dr. Futran's progress notes revealed that Plaintiff was improving, except when Plaintiff suffered "flare-ups" that appear to have resulted from her discontinuing her prescribed medications. Otherwise, as the ALJ noted, Plaintiff's symptoms were mild and under control.

Dr. Futran also failed to provide convincing support for his March, 2006, conclusion that Plaintiff could not work, and at times, his assessment was inconsistent with other evidence in the record, including inconsistent with Plaintiff's own statements. Dr. Futran noted that Plaintiff's symptoms were severe enough to interfere with her attention and concentration. Yet, Plaintiff consistently maintained that her condition had remained the same since its onset date, and in her September 21, 2004, disability report, Plaintiff wrote that she had no problem paying attention. Dr. Futran, prior to writing that Plaintiff "[could not] work at the present time," revealed that Plaintiff was capable of high stress work. AR 144. He also revealed that Plaintiff's impairments had not lasted nor were expected to last at least 12 months. Id. In his March, 2006, assessment, Dr. Futran also failed to assess Plaintiff's ability to lift and/or carry, stand and/or walk, push and/or pull, and reach, handle and/or manipulate, which is the very purpose of the functional capacity assessment. Id. at 145-48.

The undersigned concludes, and respectfully recommends that Your Honor should conclude, that the administrative record, in its entirety, provides sufficient support for the ALJ's conclusion that Dr. Futran's September, 2004, opinion was not supported by the evidence, and indeed, was inconsistent with it. Even had Dr. Futran's assessment been consistent with his own overall treatment record, I conclude, and recommend that Your Honor should conclude, that his

assessment that Plaintiff had the capacity to stand and/or walk for less than 2 hours and to sit for less than 6 hours did not deviate from the requirements of sedentary work, which require the ability to stand and/or walk for a *total of no more* than 2 hours in an 8-hour workday and to sit for *approximately* 6 hours of an 8-hour workday.

At the fifth step in the sequential analysis, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity, the ALJ consulted the grids and found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  See 20 C.F.R. Pt. 404, App. 2 § 200.00(b)("... when all factors coincide with the criteria of a rule, the existence of such jobs is established."); Heckler v. Campbell, 461 U.S. 458, 462 (1983)("[w]here a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform.  If such work exists, the claimant is not considered disabled."); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)("[i]n the ordinary case the Secretary satisfies his burden by resorting to the applicable medical vocational guidelines ....").  Since there is no mention in the medical records that Plaintiff had any nonexertional limitation(s) that required additional vocational inquiry, the ALJ appropriately consulted the grids which directed a finding that Plaintiff was not disabled.

## B.   The Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ erred by not properly evaluating her subjective complaints of pain and other symptoms.  However, an ALJ's credibility findings are entitled to deference by a reviewing court.  See Tejada, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor,

and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."); see also Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)("It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.  If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.")(internal quotation marks and citation omitted). Further, "the ALJ is obligated only to consider a complainant's subjective complaints, not to accept all of them as dispositive." Rebull, 240 F. Supp. 2d at 274.

In rendering his decision, the ALJ explicitly stated that "[t]he criteria reviewed includ[ed] the location, duration, frequency and intensity of [Plaintiff's] symptoms; plus her daily activities, her medication and her functional limitations/restrictions."  Plaintiff accuses the ALJ of having minimized Plaintiff's complaints of pain.  To the contrary, the ALJ provided ample support for his finding that Plaintiff's subjective complaints were inconsistent with her treatment record, at least to the "disabling extent" that Plaintiff alleged.

The ALJ noted that Plaintiff had alleged that the intensity of her arthritic symptoms had been the same since 2003.  However, there is ample evidence to support the ALJ's finding that Plaintiff's allegation was troublesome.  Plaintiff suffered two "flare-ups," in August, 2004, and in November, 2005, that were likely the result of her discontinuing her prescribed medications.  On occasions other than her flare-ups, Plaintiff's symptoms were mild and her arthritis was under control.  Plaintiff herself testified at the hearing that she had days that were better and days that were worse, and she stated that half of the month would be good days and half of the month would be bad days.  As the ALJ found, it is difficult to reason that Plaintiff's pain remained the

26

same during the period of her first exacerbation, when her examination revealed 36 active joints and 18 effusions, and during periods of marked improvement, when her examinations revealed no active joints, no effusions, and no inflammation.  The ALJ was also troubled by Plaintiff's allegation that she could hardly use her hands, "invariably dropping objects."  The ALJ found that the "medical record does not show any limitations in fingering or fine manipulation ability."  Neither Dr. Futran's assessment, the state agency reviewer's assessment, Dr. Li's opinion, nor Dr. Engelbrecht's opinion listed any manipulative limitations.

The ALJ also found troubling the extent to which Plaintiff alleged she was homebound.  In her hearing testimony and in her self-written disability reports, Plaintiff alleged that she was essentially bedridden; however, the ALJ found that the objective medical evidence failed to substantiate those allegations.  The regulations explain that "[the Commissioner] will consider [the claimant's] statements about the intensity, persistence, and limiting effects of [the claimant's] symptoms, and [the Commissioner] will evaluate [the claimant's] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant] is disabled."  20 C.F.R. § 404.1529(c)(4).  The ALJ did not find credible the extent to which Plaintiff was limited in her physical abilities, finding that "[o]verall, the medical signs and findings suggest that the intensity, persistence and functionally limiting effects of her symptoms do not totally preclude her ability to perform basic work-related activities."  Having determined that the ALJ's decision is supported by substantial evidence, and finding no basis to conclude that the ALJ failed to consider Plaintiff's subjective complaints, the Court finds no reason to disturb the ALJ's findings.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion (Docket #'s 11, 12, 15) should be granted, Plaintiff's cross-motion (Docket #'s 13, 14) should be denied, and the case should be dismissed.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Vincent Briccetti at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Briccetti.

Date:   July 11, 2011
        White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

28

Copies of the foregoing report and recommendation have been sent to the following:

The Honorable Vincent Briccetti, U.S.D.J.

Counsel of Record for Plaintiff and the Commissioner of Social Security.